No. 24-1635

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ROBERT D. WHITE,

Plaintiff – Appellant,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, in his official capacity as Administrator of the United
States Environmental Protection Agency; UNITED STATES ARMY CORPS OF
ENGINEERS; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official
capacity as Chief of Engineers and Commanding General, United States Army
Corps of Engineers; MICHAEL L. CONNOR, in his official capacity as Assistant
Secretary of the Army (Civil Works); UNITED STATES OF AMERICA,

Defendants – Appellees,

and

NATIONAL WILDLIFE FEDERATION;
NORTH CAROLINA WILDLIFE FEDERATION,

Intervenors/Defendants – Appellees.

On Appeal from the United States District Court
for the Eastern District of North Carolina (2:24-cv-00013-BO)
Honorable Terrence W. Boyle, District Judge

**PLAINTIFF – APPELLANT'S MOTION
FOR INJUNCTION PENDING APPEAL**

DAMIEN M. SCHIFF
CHARLES T. YATES
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
CYates@pacificlegal.org

I. CLARK WRIGHT
Davis Hartman Wright LLP
209 Pollock Street
New Bern, NC 28560
Telephone: (252) 262-7054
icw@dhwlegal.com

PAIGE GILLIARD
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
PGilliard@pacificlegal.org

*Attorneys for Plaintiff – Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................ 3

    I.   Decades of unlawful wetlands regulation................................. 3

    II.  The Supreme Court rebukes the Agencies .................................... 6

    III. The Amended Rule .................................................................... 6

    IV. Procedural history ..................................................................... 7

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ..................................................................................................... 8

    I.   Mr. White is likely to succeed on the merits of his appeal ............... 8

        A.  The Amended Rule disregards *Sackett* .................................... 9

            1.   The Amended Rule omits *Sackett*'s
                "indistinguishability" requirement ................................. 9

            2.   Omission of *Sackett*'s indistinguishability requirement
                is inconsistent with the *Rapanos* plurality ........................ 12

            3.   The portions of the 2023 Rule's preamble pertaining
                to the "relatively permanent" test demonstrate the
                Agencies' disregard for *Sackett* ...................................... 13

        B.  The Amended Rule must be rejected pursuant
           to the federalism clear statement canon ................................. 15

    II.  Mr. White will suffer irreparable harm ....................................... 16

    III. The equities and public interest favor enjoining the Amended Rule ............ 22

CONCLUSION .................................................................................................. 23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Pastides*,
 900 F.3d 160 (4th Cir. 2018) ...............................................................22

*Coal. to Def. Affirmative Action v. Granholm*,
 473 F.3d 237 (6th Cir. 2006) ........................................................ 22-23

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
 952 F.2d 802 (4th Cir. 1991) ...............................................................22

*Frazier v. Prince George's Cnty.*,
 86 F.4th 537 (4th Cir. 2023) ...................................................................8

*Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*,
 No. 2:19-CV-00050, 2024 WL 1088585 (S.D. Ga. Mar. 1, 2024),
 *appeal filed* No. 24-10710 (11th Cir. Mar. 7, 2024) ...........................10

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
 484 U.S. 49 (1987) ...............................................................................18

*Hawkes Co. v. U.S. Army Corps of Eng'rs*,
 782 F.3d 994 (8th Cir. 2015) ........................................................ 17-18

*Kentucky v. Biden*,
 57 F.4th 545 (6th Cir. 2023) .................................................................22

*Lewis v. United States*,
 88 F.4th 1073 (5th Cir. 2023) ...............................................................10

*Mahmoud v. McKnight*,
 688 F. Supp. 3d 265 (D. Md. 2023),
 *aff'd*, 102 F.4th 191 (4th Cir. 2024) ........................................................8

*Manning v. Hunt*,
 119 F.3d 254 (4th Cir. 1997) ...............................................................22

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
 76 F.4th 291 (4th Cir. 2023) ........................................................ 15-16

*Nken v. Holder*,
 556 U.S. 418 (2009) .........................................................................8, 22

*North Dakota v. EPA*,
   127 F. Supp. 3d 1047 (D.N.D. 2015)...................................................23

*Rapanos v. United States*,
   547 U.S. 715 (2006).........................................................2-6, 9, 13-14

*Sackett v. EPA*,
   142 S. Ct. 896 (2022)..................................................................5

*Sackett v. EPA*,
   598 U.S. 651 (2023)................................2-4, 6, 8-11, 13-16, 18-19, 22

*Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*,
   472 F. Supp. 2d 219 (D. Conn. 2007), *aff'd sub nom. on
   other grounds Simsbury-Avon Pres. Club, Inc. v.
   Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009) ....................................14

*Solid Waste Agency of Northern Cook County v.
   U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001)..............................................................4, 16

*Texas v. EPA*,
   662 F. Supp. 3d 739 (S.D. Tex. 2023)........................................6, 23

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ....................................................21

*Texas v. EPA*, No. 3:15-CV-00162,
   2018 WL 4518230 (S.D. Tex. Sept. 12, 2018)...........................21, 23

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994).................................................................21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016)............................................................18, 22

*United States v. Chameleon, LLC*, No. 3:23-CV-00763,
   2024 WL 3835077 (E.D. Va. Aug. 15, 2024) ............................ 10-11

*United States v. Cundiff*,
   555 F.3d 200 (6th Cir. 2009) .....................................................14

*United States v. Donovan*, No. 1:96-CV-00484,
   2010 WL 3000058 (D. Del. July 23, 2010) ......................................14

*United States v. Riverside Bayview Homes,*
   474 U.S. 121 (1985)................................................................ 3-4

*West Virginia v. EPA,*
   669 F. Supp. 3d 781 (D.N.D. 2023)....................................... 5-6, 23

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008).......................................................................8

*Wyoming Outdoor Council v. U.S. Forest Serv.,*
   165 F.3d 43 (D.C. Cir. 1999).....................................................13

**Statutes**

33 U.S.C. § 1251(b) ...................................................................16

33 U.S.C. § 1311(a) ................................................................. 1, 3

33 U.S.C. § 1319(c)(1) ...............................................................18

33 U.S.C. § 1319(g)(2)(A) ..........................................................19

33 U.S.C. § 1342(a) .....................................................................3

33 U.S.C. § 1344(a) .....................................................................3

33 U.S.C. § 1362(7) .................................................................1, 9

33 U.S.C. § 1362(12) ............................................................1, 3, 9

33 U.S.C. § 2802(5) ...................................................................14

**Regulations**

33 C.F.R. § 320.1(a)(6) ..............................................................17

33 C.F.R. § 328.3(a)(4) ........................................................... 1, 6-7

33 C.F.R. § 328.3(a)(4)(ii) ..........................................................11

33 C.F.R. § 328.3(c)(2) .................................................................1

40 C.F.R. § 19.4 .........................................................................19

40 C.F.R. § 120.2(a)(4) ............................................................1, 7

40 C.F.R. § 120.2(a)(4)(ii) ..........................................................11

40 C.F.R. § 120.2(c)(2) ..................................................................1

## Other Authorities

80 Fed. Reg. 37,054 (June 29, 2015) ...........................................5

85 Fed. Reg. 22,250 (Apr. 21, 2020) ...........................................5

88 Fed. Reg. 3004 (Jan. 18, 2023) .............................. 1, 3, 5-6, 12-13, 15

88 Fed. Reg. 61,964 (Sept. 8, 2023) ......................... 1-2, 6, 12

EPA & Dep't of the Army, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (2008), https://perma.cc/JNN9-HKEG ...........................5

Joint Coordination Memo. to the Field Between the U.S. Army Corps of Eng'rs & the U.S. Env't Prot. Agency (Sept. 27, 2023), https://www.epa.gov/system/files/documents/2023-10/2023-joint-coordination-memo-amended-2023-rule_508c.pdf ...............................7

Kihslinger, Rebecca L., et al., *Unpacking the Revised WOTUS Rule*, 53 Env't L. Rep. 10887 (2023) ..........................................11

Obtaining a Jurisdictional Determination, U.S. Army Corps of Engineers: Wilmington District (July 2017) .....................................18

Order, *Kentucky v. EPA*, No. 23-5343 (6th Cir. May 10, 2023) ........................6, 21

# INTRODUCTION

Plaintiff-Appellant Robert White asks this Court to enjoin pending appeal, as to him and his properties, Defendants-Appellees from implementing or enforcing the "adjacent wetlands" provisions of a final rule issued by the Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) (together, the "Agencies"), purporting to interpret the term "navigable waters," under the Clean Water Act (CWA), 88 Fed. Reg. 3004 (Jan. 18, 2023), *as amended*, 88 Fed. Reg. 61,964 (Sept. 8, 2023) (the "Amended Rule"), *codified at* 33 C.F.R. § 328.3(a)(4), (c)(2); and 40 C.F.R. § 120.2(a)(4), (c)(2).

Mr. White has dedicated a lifetime of hard work to building a successful commercial seafood business. To ensure financial security for himself and his children, Mr. White has invested much of his wealth in real property. That hard work is now under threat. Mr. White is unable to improve multiple properties to their highest and best use. And is subject to a financially devastating federal civil enforcement action.

The source of these threats is the unlawful authority that the Agencies have claimed to regulate private property pursuant to the CWA. The CWA regulates discharges of "pollutants" from "point sources" into "navigable waters," 33 U.S.C. §§ 1311(a), 1362(12)—defined as "the waters of the United States," *id.* § 1362(7). This definition functions as an absolute limitation on the Agencies' authority—they

may regulate discharges to "navigable waters," but no further. For over fifty years, however, the Agencies steadily expanded their claimed authority by broadly interpreting "navigable waters" to reach isolated wetlands. In 2023, that expansion of authority was brought to a halt by the Supreme Court. In *Sackett v. EPA*, 598 U.S. 651 (2023), the Supreme Court unanimously rejected the Agencies' historical approach to wetlands regulation. And a majority set forth a substantially narrowed standard for CWA authority.

This resounding defeat necessitated a dramatic break. Yet none has occurred. Instead, the Agencies issued an amended rule purporting to redefine the scope of "navigable waters." *See* 88 Fed. Reg. 61,964. Through its "adjacent wetlands" provisions, this rule continues to assert staggeringly broad authority over private land. Such a response from two agencies "whose disregard for the statutory language has been so long manifested," *Rapanos v. United States*, 547 U.S. 715, 756 n.15 (2006) (plurality), is sadly characteristic of the approach taken following every agency loss over the CWA's scope, *see Sackett*, 598 U.S. at 666-67.

This Court must intervene now to remedy the Agencies' disregard for the statutory limitations on their authority. Mr. White is likely to succeed on the merits of his appeal; he is suffering irreparable harm; and the equities and public interest favor an injunction.

Counsel for Mr. White contacted counsel for Defendants-Appellees and Intervenors/Defendants-Appellees by email on August 22, 2024. Both oppose this motion. Mr. White first moved for an injunction pending appeal in the district court, on July 12, 2024. A162-164. On August 20, 2024, the district courted denied that motion, concluding that Mr. White is unlikely to succeed on the merits. A165-167.[1]

## BACKGROUND

### I. Decades of unlawful wetlands regulation

Nonexempt discharges of "pollutants" from "point sources" to "navigable waters," 33 U.S.C. §§ 1311(a), 1362(12), require a permit from either EPA, or, if the discharge involves "dredged or fill material," from the Corps, *see id.* §§ 1342(a), 1344(a). The significant costs and liabilities that the CWA imposes underscore the vital importance of clearly demarcating its geographic reach—that is, the meaning of "navigable waters." *See Sackett*, 598 U.S. at 661.

In a series of rulemakings culminating in the so-called "1986 Regulations," *see* 88 Fed. Reg. at 3005 & nn.3-4, the Agencies extended the scope of their claimed authority to regulate "navigable waters" to the outer limits of Congress's power to regulate interstate commerce, *see Rapanos*, 547 U.S. at 724. Between 1985 and 2001, the Supreme Court addressed the Agencies' authority twice. *See United States*

---

[1] Mr. White submits an appendix containing all previous applications for relief and their outcomes, along with other relevant parts of the record. Mr. White has conferred with the parties as to its contents.

3

*v. Riverside Bayview Homes*, 474 U.S. 121, 134 (1985) (concluding Agencies could regulate wetlands "inseparably bound up with the 'waters' of the United States"); *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167-68 (2001) (rebuffing Agencies' attempt to regulate "nonnavigable, isolated, intrastate waters"). The Agencies responded to each by expanding their authority further. *See Sackett*, 598 U.S. at 665-66.

In *Rapanos*, five members of the Court held the 1986 Regulations to be invalid insofar as they purport to regulate all tributaries of traditionally navigable waters and all adjacent wetlands. *Rapanos*, 547 U.S. at 728 (plurality); *id.* at 759 (Kennedy, J., concurring). No opinion garnered a majority. Justice Scalia (writing for a four-justice plurality) noted that the ordinary meaning of "waters" includes "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes,'" *id*. at 739 (quoting Webster's Second at 2882). "Wetlands" would not normally fall under this definition. *See Riverside Bayview*, 474 U.S. at 132. Accordingly, the plurality reasoned that "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Rapanos*, 547 U.S. at 742. Although Justice Kennedy provided the fifth vote, he proposed a broader "significant

4

nexus" standard—under which a wetland may be regulated if it "significantly" affects the physical, chemical, and biological integrity of "waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring).

Shortly after *Rapanos*, the Agencies issued guidance. *See* Memorandum re: Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States* (2008).[2] Then, they embarked upon two rulemakings. *See* 80 Fed. Reg. 37,054, 37,056 (June 29, 2015); 85 Fed. Reg. 22,250 (Apr. 21, 2020). Each rule failed. *See West Virginia v. EPA*, 669 F. Supp. 3d 781, 792 (D.N.D. 2023) (recounting history of preliminary injunctions and adverse judgments)*.*

On January 24, 2022, the Supreme Court granted certiorari in *Sackett* to determine the "proper test for determining whether wetlands [are] 'waters of the United States' under the Clean Water Act . . . ." *Sackett v. EPA*, 142 S. Ct. 896, 896 (2022). Notwithstanding their dismal track record and *Sackett*'s promise of guidance, on January 18, 2023, the Agencies persisted in defining "navigable waters" again. *See* 88 Fed. Reg. 3004. The 2023 rule allowed for regulation pursuant to a test superficially inspired by the *Rapanos* plurality—the so-called "relatively

---

[2] *Available at* https://perma.cc/JNN9-HKEG.

permanent standard." *Id.* at 3004-07. But it primarily relied upon a broad "significant nexus standard." *Id.* The 2023 Rule met the same fate as its predecessors.[3]

## II.    The Supreme Court rebukes the Agencies

On May 25, 2023, the Supreme Court issued its decision in *Sackett*. 598 U.S. 651. In *Sackett*, the Supreme Court unanimously rejected the significant nexus test. *Id.* at 684; *id.* at 715-16 (Kavanaugh, J., concurring). And a majority "conclude[d] that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water "forming geographic[al] features" that are described in ordinary parlance as "streams, oceans, rivers, and lakes.""" *Id.* at 671 (quoting *Rapanos*, 547 U.S. at 739). The majority further concluded that "wetlands must qualify as 'waters of the United States' in their own right. In other words, they must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Id.* at 676.

## III.    The Amended Rule

On September 8, 2023, the Agencies issued amendments to the 2023 Rule. The Agencies' deleted those provisions codifying the significant nexus test but left intact the remainder of the rule. *See* 88 Fed. Reg. at 61,968-69. The Amended Rule authorizes regulation of wetlands "adjacent to" other covered waters. 33

---

[3] *See Texas v. EPA*, 662 F. Supp. 3d 739 (S.D. Tex. 2023); *West Virginia*, 669 F. Supp. 3d 781; Order, *Kentucky v. EPA*, No. 23-5343 (6th Cir. May 10, 2023), *available at* A44-50. These injunctions do not apply to Mr. White or his properties.

C.F.R. § 328.3(a)(4); 40 C.F.R. § 120.2(a)(4). It defines "adjacent" as having "a continuous surface connection." *Id*. Those portions of the 2023 Rule's preamble explaining the Agencies' approach to the "relatively permanent test" still generally govern. *See* Joint Coordination Memo. to the Field Between the U.S. Army Corps of Eng'rs & the U.S. Env't Prot. Agency 1 (Sept. 27, 2023).[4]

## IV.   Procedural history

Mr. White filed this lawsuit on March 14, 2024. A168. On April 2, 2024, he moved for a preliminary injunction. A169. On May 16, 2024, Defendants/Intervenors-Appellees were granted leave to intervene. A172. After holding a hearing on June 4, 2024, A172-173, on June 18, 2024, the district court denied the motion, A137-161. The district court agreed that Mr. White has standing to challenge the Amended Rule and that his claims are ripe. A145-151. The district court, however, determined that Mr. White would not succeed on the merits. A160. It declined to reach the other factors. A160. Mr. White appealed on July 8, 2024, A173, and on July 12, 2024, moved for an injunction pending appeal, A173. On August 20, 2024, the district court denied that motion. A165-167.

---

[4] *Available at* https://www.epa.gov/system/files/documents/2023-10/2023-joint-coordination-memo-amended-2023-rule_508c.pdf.

7

# STANDARD OF REVIEW

"The standard for injunctive relief pending appeal is the same as for a preliminary injunction." *Mahmoud v. McKnight*, 688 F. Supp. 3d 265, 306 (D. Md. 2023), *aff'd*, 102 F.4th 191 (4th Cir. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). A movant must establish four factors: "(1) that he's likely to succeed on the merits; (2) that he's likely to suffer irreparable harm if preliminary relief isn't granted; (3) that the balance of equities favors him; and (4) that an injunction is in the public interest." *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

# ARGUMENT

## I. Mr. White is likely to succeed on the merits of his appeal

Because the "adjacent wetlands" provisions of the Amended Rule do not require wetlands to be "indistinguishable," *Sackett*, 598 U.S. at 684, from covered waters, they violate *Sackett*'s test for wetlands authority. Thus, they are contrary to and exceed the CWA's limited grant of authority to the Agencies to regulate "navigable waters." The Agencies' interpretation must be further rejected pursuant to the federalism clear statement canon.

## A. The Amended Rule disregards *Sackett*

### 1. The Amended Rule omits *Sackett*'s "indistinguishability" requirement

The text of the CWA authorizes the Agencies to exercise authority only over "navigable waters," defined as "the waters of the United States." 33 U.S.C. § 1362(7), (12). In *Sackett*, the Supreme Court held that this provision authorizes the Agencies to regulate only: (1) "those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes,'" *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739); and (2) "wetlands" (i) with a "continuous surface connection" to such waters and (ii) that are "'as a practical matter indistinguishable from waters of the United States,' such that it is 'difficult to determine where the "water" ends and the "wetland" begins,'" *id.* at 678 (quoting *Rapanos*, 547 U.S. at 742). If a wetland does not satisfy these mandatory conditions, it is, as a matter of law, not among the regulable "navigable waters."

Integral to *Sackett*'s test is that regulable wetlands "must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Id.* at 676. "Wetlands that are separate from traditional navigable waters" on the other hand, "cannot be considered part of those waters, even if they are located nearby." *Id.* This is so because *Sackett*'s central holding is that the CWA exists to protect "waters"—rivers, lakes, and streams—so that features like wetlands that are typically regarded

as non-waters, *see id*. at 674, are presumptively outside the scope of the statute, and can be regulated only in those rare instances when they "qualify as 'waters . . .' in their own right," *id.* at 676.

So central is *Sackett*'s indistinguishability requirement, that the word "indistinguishable" is used more often than the phrase "continuous surface connection" in the Court's recitation of the test—including in its ultimate reasoning that the Sacketts' property was non-jurisdictional. *See Sackett*, 598 U.S. at 684 ("The wetlands on the Sacketts' property are distinguishable from any possibly covered waters."). Lower courts applying *Sackett*'s test have similarly confirmed the centrality of "indistinguishability." *See Lewis v. United States*, 88 F.4th 1073, 1078 (5th Cir. 2023) (concluding that "it is not difficult to determine where the 'water' ends and any 'wetlands' on Lewis's property begin"); *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, No. 2:19-CV-00050, 2024 WL 1088585, at *5 (S.D. Ga. Mar. 1, 2024), *appeal filed* No. 24-10710 (11th Cir. Mar. 7, 2024) (concluding that plaintiffs failed to allege the land in question "has *such a* continuous surface connection to [the creek] that it is 'indistinguishable' from it" (citing *Sackett*, 598 U.S. at 678) (emphasis added)); *United States v. Chameleon, LLC*, No. 3:23-CV-00763, 2024 WL 3835077, at *3 (E.D. Va. Aug. 15, 2024) ("WOTUS includes traditional navigable waters, 'relatively permanent' tributaries of such waters, and

10

wetlands that are indistinguishable from such waters." (quoting *Sackett*, 598 U.S. at 678-79)).

The Amended Rule unlawfully omits *Sackett*'s indistinguishability requirement. Instead, the Agencies assert that they may regulate any wetland "adjacent" to a relatively permanent body of water, so long as the wetlands have "a continuous surface connection." 40 C.F.R. § 120.2(a)(4)(ii); 33 C.F.R. § 328.3(a)(4)(ii). By defining "navigable waters" as covering wetlands "with a continuous surface connection" to a covered water, *id.*, but failing to include the requirement that such wetlands be "indistinguishable" from those waters, *Sackett*, 598 U.S. at 684, the Amended Rule regulates far beyond what *Sackett* allows.

The Agencies have argued—and the district court agreed—that indistinguishability is not a central component of the *Sackett* test, but rather the necessary outcome of a continuous surface connection. *See* A153-156. This reading cannot be sustained. To render "indistinguishability" merely the logical outcome of *Sackett*'s operative test—as opposed to an integral component of it—makes a wash of *Sackett*'s central holding. *See supra* 9-10. *Accord* Rebecca L. Kihslinger, et al., *Unpacking the Revised WOTUS Rule*, 53 Env't L. Rep. 10887, 10892 (2023) (comments of Royal C. Gardner) (emphasizing that the word "indistinguishable" in *Sackett* is "not a mere rhetorical flourish").

### 2. Omission of *Sackett*'s indistinguishability requirement is inconsistent with the *Rapanos* plurality

The Agencies have argued that because the 2023 Rule adopted a so-called "relatively permanent" test inspired by the *Rapanos* plurality, *see* 88 Fed. Reg. at 61,964-66, and because *Sackett* adopted the *Rapanos* plurality's test, the Amended Rule's reenactment of those provisions of the 2023 Rule should be upheld. Any such argument is untenable, for at least two reasons.

***First***, although the 2023 Rule's "relatively permanent" standard bears some superficial resemblance to the *Rapanos* plurality's test, the Agencies were *explicit* that they were not adopting either *Rapanos* test. *See* 88 Fed. Reg. at 3021 ("not an interpretation of the multiple opinions in *Rapanos*"). Indeed, the Agencies' attitude towards the *Rapanos* plurality in the 2023 Rule can only be described as one of hostility. *See id.* at 3039 ("the *Rapanos* plurality relied on a strained reading of the Act that is inconsistent with the text of the statute"). To the extent that the Agencies were willing to concede *anything* to the "relatively permanent" standard, it was merely to assume that wetlands meeting this test would typically be jurisdictional under the 2023 Rule's primary "significant nexus"-inspired test, such that the "relatively permanent" standard would provide an administrative shortcut for assessing jurisdiction under the "significant nexus" test. *See id.* at 3034. This Court should view with skepticism any contention that the Agencies' prior dismissal of the *Rapanos* plurality now embodies a faithful codification of it.

**Second**, indistinguishability was likewise integral to the *Rapanos* plurality. *See Rapanos*, 547 U.S. at 755 ("Wetlands are 'waters of the United States' if they bear the 'significant nexus' of physical connection, which makes them as a practical matter *indistinguishable* from waters of the United States." (emphasis in original)); *id.* at 742 (requiring "that there is no clear demarcation between 'waters' and wetlands").

### 3. The portions of the 2023 Rule's preamble pertaining to the "relatively permanent" test demonstrate the Agencies' disregard for *Sackett*

The Agencies' disregard for *Sackett*'s requirements is demonstrated further by those portions of the preamble to the 2023 Rule pertaining to the "relatively permanent test," 88 Fed. Reg. at 3090-96—which the Agencies have confirmed still generally govern, *see supra* 7. *Cf. also Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("[T]he preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules.").

For example, despite the touchstone of *Sackett*'s test being a "difficult[y]" in "determin[ing] where the 'water' ends and the 'wetland' begins," *Sackett*, 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 742), the Agencies contend that the connection between water and wetland need not be based upon the continuous presence of surface water. *See* 88 Fed. Reg. at 3095-96. Such a position plainly conflicts with *Sackett*, which expressly contemplates that any surface connection between water

and wetland be *aquatic*. *Sackett*, 598 U.S. at 678 (contemplating that surface water must be continuously present, absent "temporary interruptions . . . because of phenomena like low tides or dry spells"); *id.* (suggesting wetlands having an "unimpaired connection with the open sea up to the head of tidal influence" as an example of covered wetlands (quoting 33 U.S.C. § 2802(5))). Indeed, it is logically impossible for two *water* features to be "indistinguishable" absent a continuous aquatic connection. The Agencies' position also conflicts with prior authorities opining on, or applying, the *Rapanos* plurality. *See Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring) ("when a surface-water connection is lacking, the plurality forecloses jurisdiction over wetlands that abut navigable-in-fact waters"); *United States v. Cundiff*, 555 F.3d 200, 211-13 (6th Cir. 2009) ("the [*Rapanos*] plurality's test requires a topical flow of water"); *United States v. Donovan*, No. 1:96-CV-00484, 2010 WL 3000058, at *5 (D. Del. July 23, 2010) ("unbroken surface water connection"); *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 472 F. Supp. 2d 219, 224 (D. Conn. 2007), *aff'd sub nom. on other grounds Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009) ("Plaintiffs do not dispute defendant's reading that *Rapanos* requires a continuous surface water connection[.]").

The Agencies further contend that, even after *Sackett*, they may assert authority through daisy-chain "connections" between a wetland and a "water" via

"discrete feature[s] like a non-jurisdictional ditch, swale, pipe, or culvert." 88 Fed. Reg. at 3093, 3095. And, given the Agencies' view that the connection need not be aquatic, presumably even dry intermediate features are sufficient. *See id.* at 3095-96. But *Sackett*'s requirement that there exist "no clear demarcation between 'waters' and wetlands," *Sackett*, 598 U.S. at 678, would mean nothing if the Agencies could establish jurisdiction through a series of dry intermediate features. Indeed, this mode of analysis subjects landowners to precisely the sort of "freewheeling inquiry" the Court in *Sackett* sharply criticized. *Id.* at 681.

Most egregiously, the Agencies maintain that they may regulate even where a physical barrier separates a wetland from a covered water. *See* 88 Fed. Reg. at 3090, 3095-96. The Agencies advance this position despite *Sackett*'s express holding that, unless constructed illegally, "a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction . . . ." *Sackett*, 598 U.S. at 678 n.16.

## B. The Amended Rule must be rejected pursuant to the federalism clear statement canon

The Agencies' construction of the CWA as set forth in the Amended Rule also raises serious federalism questions, counselling that it be rejected. It is an axiomatic rule of construction that "Congress must be explicitly clear if it wishes to 'alter[] the federal-state framework by permitting federal encroachment upon a traditional state

power.'" *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 298 (4th Cir. 2023) (quoting *SWANCC*, 531 U.S. at 172-73).

As evidenced by Mr. White's case alone: the Amended Rule has resulted in the regulation of sand mining, *see* A55; the regulation of crop production, *see* A56; and the regulation of a bulkheading project's alleged impacts landward of waters, *see* A102-106. Each of these activities is firmly within the states' traditional domain, *see Sackett*, 598 U.S. at 679 ("Regulation of land and water use lies at the core of traditional state authority."). Yet, the Agencies have not pointed to any clear statement to justify this expansive foray. Indeed, to the contrary, the CWA explicitly admonishes *against* the Agencies' conduct. *See SWANCC*, 531 U.S. at 174 ("Congress chose to 'recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources[.]'" (quoting 33 U.S.C. § 1251(b))).

## II.    Mr. White will suffer irreparable harm

Mr. White is the owner of numerous parcels of land. A51. Many of these lands are relatively low-lying and portions border the Pasquotank River, Big Flatty Creek, and other water bodies. A51. These lands are utilized for a variety of longstanding commercial purposes, and require regular maintenance and erosion control, which

can raise questions of state and federal wetlands jurisdiction. A51-52.[5] As a result, many of Mr. White's property holdings and all possible future plans—indeed, his very livelihood—were placed in jeopardy when the Agencies finalized the Amended Rule. That rule codifies an unlawfully broad view of the Agencies' authority over wetlands. *See supra* 9-16. But for the Agencies' erroneous view of their own authority, many, if not all, of Mr. White's properties—being distinguishable from, and lacking any surface water connection to, covered waters—would be non-jurisdictional. *See* A54.

However, because the Amended Rule is expansive in describing "navigable waters," and will require time-consuming, costly, and unpredictable case-by-case determinations, Mr. White cannot know which features on his properties lawfully are covered by the CWA, and which are not, without further expending extraordinary resources. *See* A55. Although, the Corps provides a process to seek a determination as to the status of one's property—a so-called "approved jurisdictional determination," *see* 33 C.F.R. § 320.1(a)(6)—this process is time consuming and expensive, *see Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 1003 (8th Cir. 2015) (Kelly, J., concurring) ("This is a unique aspect of the CWA; most laws do not require the hiring of expert consultants to determine if they even apply to you

---

[5] Indeed, Mr. White is already defending against a civil enforcement action in which the United States has alleged CWA violations on portions of his properties. A53-54.

or your property."); Obtaining a Jurisdictional Determination, U.S. Army Corps of Engineers: Wilmington District at 3 (July 2017)[6] ("recommend[ing] that [a landowner] contract with an environmental consultant" in order "[t]o expedite" any AJD request).

These costs would balloon further should Mr. White be required to seek a CWA permit. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594-95 (2016) (observing that an individual dredge-and-fill permit typically takes more than two years and $270,000 in consulting costs to secure). And any permit would still likely result in costly changes to Mr. White's intended operations. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52-53 (1987). Raising the stakes even higher is the fact that should Mr. White—even inadvertently—fail to run this regulatory gauntlet, he would face "'crushing' consequences," *Sackett*, 598 U.S. at 660 (quoting *Hawkes*, 578 U.S. at 602 (Kennedy, J., concurring)). A first-time criminal offense for even *negligently* discharging into "navigable waters" without a permit is punishable by criminal penalties of up to $25,000 per violation per day, and up to one year in prison. 33 U.S.C. § 1319(c)(1). EPA may also impose civil penalties of up to $64,618 per discharge, per day, per offense, without regard

---

[6] *Available at* A134-136.

to any knowledge of a feature's jurisdictional status. 33 U.S.C. § 1319(g)(2)(A); 40 C.F.R. § 19.4.

The Amended Rule therefore presents Mr. White with an impossible choice: (1) let his lands lay undeveloped—severely reducing his income; (2) engage in the time-consuming and expensive process of paying others to investigate the Agencies' potential claim of authority, and then endure an even more time-consuming and expensive permitting process, with uncertain results; or (3) face severe penal consequences. This "unappetizing menu of options," *Sackett*, 598 U.S. at 671, has caused—and will continue to cause—Mr. White substantial economic injury.

For example, Mr. White has plans to construct a sand mine on one of his properties. A52-53. At considerable expense he hired a consultant and secured the necessary state permit. A52-53. As a condition of the permit, Mr. White was required to post, and must maintain, a security bond in the amount of $88,100.00, and he must submit annual reports which he pays a consultant to prepare. A52-53. Yet, due to the overbroad authority asserted by the Agencies—as codified in the Amended Rule— the Agencies have specifically prohibited Mr. White from further developing this mine, under threat of additional enforcement. A55. This has been financially devastating. With each day of non-operation, the chances increase that Mr. White may never recoup his substantial investment in the mine, much less generate any

profit from it. A55. And he continues to tie up an $88,100.00 security bond that could be profitably invested elsewhere. A52-53.[7]

Similarly, Mr. White is currently engaged in a crop-sharing arrangement on various portions of his properties. A53. To ensure compliance with the Agencies' broad view of their CWA authority—as set forth in the Amended Rule—Mr. White has been compelled to fallow certain areas of cropland and refrain from further improvements on these lands, thus diminishing current and future revenue. A56. Moreover, Mr. White's inability to perform erosion control measures on these properties—due to uncertainty in the CWA's application—means his farmlands continue to erode at high rates. A56. In fact, Mr. White is daily losing arable farmland. A56.

Although these activities would constitute an otherwise lawful use of Mr. White's properties, the Amended Rule presents him with no choice but to alter his plans to accommodate the possibility that one or more Defendants-Appellees will deem these activities to constitute unlawful "discharges" of "pollutants" into

---

[7] While it is true that the sand mine is located on one of the properties subject to the enforcement action, *see* A122-123, Mr. White's operation of the sand mine is not the subject of any alleged violation, *see* A99-106, and the resolution of the enforcement action does not bear directly on Mr. White's ability to operate the mine. The bottom line is that Mr. White would operate his sand mine but for the scope of authority codified in the Amended Rule, and the Agencies' threats of *additional* enforcement. A52-53, A55, A57-59.

wetlands determined to be "navigable waters." A56-57. Mr. White would pursue the activities—and many others—if not for the Amended Rule. A57. Mr. White has forgone many tens of thousands of dollars in revenue already, with that figure mounting each day. A57.

These costs to comply with the Amended Rule constitute irreparable harm. *See Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) ("[A] regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment))). Indeed, Federal courts addressing prior challenges to definitions of "navigable waters" have routinely treated as irreparable harm compliance costs of the nature incurred by Mr. White. *See* Order, *Kentucky*, No. 23-5343, at 6 ("the apparent confusion over what new waters the Final Rule will cover and the likelihood that the Associations will incur costs to ensure their compliance weigh in favor of granting an injunction"); *id.* at 5-6 (determining that the "need to hire consultants to determine what project changes, permitting, or mitigation may be required under the rule" was irreparable harm); *Texas v. EPA*, No. 3:15-CV-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018) ("Were the Court not to temporarily enjoin the Rule now, it risks asking the states, their governmental subdivisions, and their citizens to expend valuable resources and time operationalizing a rule that may not survive judicial review.").

Likewise, these compliance-related irreparable harms are "neither remote nor speculative, but actual and imminent." *Manning v. Hunt*, 119 F.3d 254, 264 (4th Cir. 1997) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Mr. White has concrete plans that involve dredging and filling relatively low-lying lands bordering waters. *See* A51-60. And the Amended Rule presents a significant impediment to these plans—Mr. White must unquestionably abide by the Amended Rule's delineation of what is or is not lawful, or face "'crushing' consequences" for even an inadvertent violation. *Sackett*, 598 U.S. at 660 (quoting *Hawkes*, 578 U.S. at 602 (Kennedy, J., concurring)). Indeed, given that the Agencies are already pursuing a civil enforcement action as to portions of his properties, *see* A99-106, Mr. White's fears of additional enforcement are far from hypothetical—and the steps he has taken to comply with the Amended Rule are certainly reasonable, *cf. Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) ("The most obvious way to demonstrate a credible threat of enforcement in the future, of course, is an enforcement action in the past.").

## III.    The equities and public interest favor enjoining the Amended Rule

The final two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. There is no public interest in preserving an unlawful rule. *See Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("[A]t bottom, 'the public interest lies in a correct application' of the law." (quoting *Coal. to Def. Affirmative*

*Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006))). Numerous courts have recognized—in this very context—that "[i]t benefits the public to 'ensure that federal agencies do not extend their power beyond the express delegation from Congress.'" *West Virginia*, 669 F. Supp. 3d at 818 (quoting *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1060 (D.N.D. 2015)). *See also Texas*, 662 F. Supp. 3d at 757 (same); *Texas*, 2018 WL 4518230, at *1 ("overwhelming" public interest).

Because the Amended Rule is an unlawful deviation from the rule set forth in *Sackett*, *see supra* 9-16, it follows that the public interest and equities favor an injunction.

## CONCLUSION

This Court should enjoin all Defendants-Appellees from implementing or enforcing the Amended Rule, as to Mr. White and his properties, during the pendency of Mr. White's appeal.

DATED: August 27, 2024.

Respectfully submitted,

DAMIEN M. SCHIFF
CHARLES T. YATES
PAIGE E. GILLIARD
I. CLARK WRIGHT

By: /s/ Charles T. Yates
    CHARLES T. YATES
*Attorneys for Plaintiff – Appellant*

23

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24-1635          **Caption:** Robert White v. EPA

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____5,184_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
14 point Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Charles T. Yates _____

Party Name Plaintiff-Appellant Robert D. White

Dated: 8/27/2024 _____